## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **LINDSEY KENT SPRINGER,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **No. 3:20-CV-3088-B (BH)** |
| | ) | |
| **UNITED STATES OF AMERICA, et al.,** | ) | |
| **Defendants.** | ) | **Referred to U.S. Magistrate Judge[1]** |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Based on the relevant filings and applicable law, the United States' *Motion to Dismiss Plaintiff's First Amended Complaint and Memorandum in Support Thereof*, filed on March 15, 2021 (doc. 12), should be granted in part, and Plaintiff's claims against it should be **DISMISSED** without prejudice for lack of subject matter jurisdiction. Mark Christian and Ernesto Rosales' *Individual Defendants' Motion to Dismiss and Memorandum in Support Thereof*, filed on March 15, 2021 (doc. 13), should be granted in part, and Plaintiff's claims against them should be **DISMISSED** with prejudice for failure to state a claim. The Bureau of Prisons' (BOP) *Motion to Dismiss Plaintiff's FOIA Claims*, received on March 15, 2021 (doc. 14), should be granted, and Plaintiff's claim against it should be **DISMISSED** without prejudice as moot.  Plaintiff's motion for leave to file a sur-reply (doc. 27) is **DENIED**.

### I. BACKGROUND

Plaintiff Lindsey Kent Springer (Plaintiff) claims that he was exposed to asbestos and mold while working in a warehouse at the Federal Correctional Institution in Seagoville, Texas (FCI-Seagoville), where he was incarcerated. (doc. 3 at 1.) Alleging that this exposure and the Defendants' subsequent response violated his rights under the Eighth Amendment to the

---

[1] By *Special Order No. 3-251*, this *pro se* prisoner case has been automatically referred for full case management.

Constitution; the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b)(1), 2671-2680; and the Freedom of Information Act (FOIA), 5 U.S.C. § 552 *et seq.*, Plaintiff sues the United States; the BOP; Mark Christian, the former acting environmental and safety compliance administrator of FCI-Seagoville (Administrator); and the former assistant warden of FCI-Seagoville, Ernesto Rosales (Warden) (collectively, Defendants), for both monetary and injunctive relief. (doc. 3 at 1, 3-4.)

## A.    **The Warehouse**

Plaintiff alleges that FCI-Seagoville houses a warehouse (Warehouse) that was built in the late 1930s and was presumably constructed and built using "Asbestos Containing Material." (*Id.* at 5) (citing 29 C.F.R. §§ 19.10.1001(a), (b), and (j)(2)). Shared by the Food Service Department, Trust Fund Commissary, and Laundry Department, it had previously been found to contain "cancer causing asbestos." (*Id.*) The warehouse contains two storage rooms (Storage 1 and 2) that have been used as (1) a morgue, (2) freezers for the inmates' food, and (3) dry storage rooms for a variety of products, ranging from toilet paper to dangerous chemicals used to clean the prison. (*Id.*) As of November 1, 2016, both rooms were controlled by the Food Service Department. (*Id.* at 7.)

On or about April 1, 2017, the freezer system in Storage 1 went down, and the assistant food service administrator decided to convert the room into a dry storage area for food service. (*Id.*) This process entailed moving the contents of Storage 1 into Storage 2, as well as into "mobile freezers positioned outside and around the Warehouse and Facilities." (*Id.*) On or about May 1, 2017, the assistant food administrator began to use Storage 1 as a dry storage room for the inmates' food. (*Id.* at 8.) At this point, Storage 2 contained a freezer controlled by the Food Service Department. (*Id.*) The assistant food service administrator could see the "inmate food was being covered (outer surfaces to card board boxes) with a fine dusty substance and chunks of a black surface, apparent

2

to all the source of which was from the ceiling and walls therein." (*Id.*)  He therefore decided that Storage 1 would no longer be used to store inmate food; it was instead converted into a chemical storage room. (*Id.*) At this point, Storage 1 and 2 had solid doors, approximately 8 inches thick with a built-in defrost mechanism, with a latch, lock, and seal. (*Id.*)

On or about July 1, 2017, in anticipation of an annual inspection, the food service administrator determined that Storage 1 and 2 would fail inspection, so they were "abandoned." (*Id.* at 9.)  Both rooms had a history of leaking water from under the solid doors, and Storage 2 leaked water in "such a magnitude that repairing it before inspection was not feasible..." (*Id.*) The food service administrator emailed the trust fund administrator and advised that the Food Service Department would no longer be responsible for anything involving Storage 1 and 2, and the Food Service Department locks were removed from both doors. (*Id.*) At some point in July 2017, the freezer system in Storage 2 broke down, and its contents were moved into a mobile freezer trailer outside the warehouse. (*Id.*)

On or about September 1, 2017, the Warehouse supervisor emailed Administrator about the falling substances as well as the strong odor in both storage rooms. (*Id.*) At this point, it was routine for inmates to "clean off" the dusty and black matter that had fallen from the walls and ceilings from property being removed from Storage 2 before delivery to its final destination. (*Id.*)

Around September 23, 2017, Warden, Administrator, and other individuals examined the Warehouse. (*Id.* at 11.) Administrator tested the black substance in both storage areas on October 20, 2017, and found that the substance and smell was only mildew. (*Id.*) On or about October 27, 2027, Administrator and other individuals appeared at the Warehouse in full body suits and with respiratory protection to spray a soapy substance into both rooms. (*Id.*)  Before spraying,

Administrator had all inmates, including Plaintiff, remove all property from the storage areas. (*Id.*)

As of November 15, 2017, both storage rooms were "completely open and exposed to the elements of the weather due to their position in the breeze-way part of the [W]arehouse." (*Id.*) Between roughly December 15, 2017, through January 15, 2018, two "gate style doors" were manufactured for the rooms, allowing the air from inside the storage areas to filter into the breeze ways while keeping property secure . (*Id.* at 11-12.) The new gate doors did not stop the strong odor, however. (*Id.* at 12.) Also, the dust and "black chunks" covering the property increased in volume, "only now both were compiling outside [the rooms] and [evident from] the air of the Breeze-way and the floor." (*Id.*) During the winter months of 2017-2018, the breeze-way doors remained closed, allowing the heat to remain inside the Warehouse as much as possible and circulating the air from the storage rooms into the surrounding areas. (*Id.*)

On or about July 1, 2018, both Administrator and Warden left FCI-Seagoville for other positions. (*Id.*) In July 2018, a new safety administrator arrived and visited the Warehouse. (*Id.* at 13.) In early September 2018, the new safety administrator announced that he would have the walls and ceilings in the storage areas tested, rejecting Administrator's "mildew prognosis." (*Id.*) On or about October 9, 2018, the new safety administrator tested the substances falling from the ceilings. (*Id.*) The next day, commissary staff placed two 8.5 by 11 inch signs on the doors, which stated that neither staff or prisoners were to enter either room. (*Id.*) The new safety administrator had Plaintiff and another inmate cover both doorways with a sign stating, "Danger, Asbestos, May Cause Cancer, Cause Damage to Lungs, Authorized Personnel only. 29 CFR [1910-1001(j)(4)(I)]. C. Rees, Safety Manager Ext. 4431." (*Id.*)

On October 18, 2018, the new safety administrator informed Plaintiff that the percentage of

4

cancer-causing asbestos in the storage rooms was 10%, and the strong odor came from a major case of mold in both rooms. (*Id.* at 14.) The new safety administrator explained these findings to the Warehouse supervisor and other prisoners. (*Id.*)

Beginning on or about May 6, 2019, and continuing through May 14, 2019, ARC Abatement "performed abatement procedures regarding the Asbestos and Mold found falling from the walls and ceilings in both" storage rooms. (*Id.* at 17.)

## B.    Plaintiff's Exposure

Plaintiff was incarcerated at FCI-Seagoville from March 16, 2016, through September 12, 2019. (*Id.* at 5.) During that time, he often worked in or in close proximity to the storage rooms. Starting in April 2016, his first job was with the laundry department, which was located above the power plant and connected to the Warehouse. (*Id.* at 5.) He was then relocated into a third storage room adjacent to Storage 2. (*Id.* at 6.) On or about November 1, 2016, Plaintiff was promoted to the position of Warehouse clerk, and his desk was located just outside of the Warehouse staff office. (*Id.*) In addition to moving property to and from the Warehouse, he was tasked with keeping its overall appearance clean, and he usually spent an hour each day sweeping the front deck of the Warehouse and the breeze-way areas just outside of the storage areas. (*Id.* at 6-7.)

On or about April 1, 2017, Plaintiff was tasked with tearing down and removing the shelf system in Storage 1 in connection with moving its contents to Storage 2, cleaning it throughly, and re-assembling it in the laundry department. (*Id.* at 7.) He alone "totally cleaned all the foreign substances," which consisted of dusty, dry, black chunks and black smaller substances, that were on the shelf, the floor, and scattered throughout the room. (*Id.*) At no time was Plaintiff instructed to wear any kind of protective gear, or informed by the Warehouse staff that the substance being

cleaned contained "cancer-causing asbestos or breath-taking mold." (*Id.* at 7-8.)

On or about June 1, 2017, Plaintiff assisted the food service administrator in "removing safety notices from the second floor of food service [W]arehouse" and moving them inside Storage 1. (*Id.* at 8.)

Around this same time, Plaintiff and other inmates began to suffer upper respiratory breathing issues, including excessive nose bleeds. (*Id.*) A nurse told him that the cedar pollen caused the bleeding, and he and other inmates were prescribed Fluticasone Propionate. (*Id.*)  Plaintiff was still unaware at this point that Storage 1 had an excessive mold problem, or that the substance he was handling on an almost daily basis was cancer-causing asbestos. (*Id.*)

On or around August 1, 2017, Plaintiff was instructed by the commissary warehouse supervisor that he was now "fully responsible" for cleaning and maintaining the storage rooms. (*Id.* at 9.)  He also helped fill the rooms with BOP property to be used by and distributed to inmates or executive and medical staff. (*Id.* at 10.) On numerous occasions, Plaintiff cleaned both storage areas when they were empty, which made cleaning easier. (*Id.*)  By the time the commissary warehouse supervisor emailed Administrator about the falling substances in the storage areas, Plaintiff was routinely ridding all property being removed from Storage 2 of the dusty and black matter that had fallen onto it from the walls and ceiling. (*Id.*)

After Administrator tested the areas and found only mildew, he ordered Plaintiff and other inmates to remove all property from the storage rooms so that he could spray for mildew. (*Id.* at 11.) Plaintiff was then directed to clean off all property that had been removed from the rooms before returning it to its designated storage room. (*Id.*)

On or about November 15, 2017, the commissary warehouse supervisor instructed Plaintiff

to remove both solid doors to combat the strong odor in the rooms after Administrator's mildew treatment, and new doors were installed. (*Id.*) From December 15, 2017, to September 15, 2018, Plaintiff continued to use and frequent both storage rooms as a routine part of his ongoing job duties, "continuing to clean, sweap [sic], and breath in dust covering the property, including the black substances present." (*Id.* at 12.)   At all times, Plaintiff remained on "chronic care" for upper respiratory issues. (*Id.*)

On or about July 24, 2018, the new safety administrator visited the Warehouse for the first time and specifically introduced himself to Plaintiff and other Warehouse staff and inmates. (*Id.* at 13.) Plaintiff was informed by the commissary warehouse supervisor on or about October 15, 2018, that he would be departing the Warehouse for a new administrative job within FCI-Seagoville. (*Id.* at 13-14.)

On October 18, 2018, the new safety administrator explained to Plaintiff that air samples revealed that the "percentage of cancer causing asbestos in both Storage 1 and 2 was 10% and the strong odor came from a major case of mold in both rooms." (*Id.* at 14.)  These findings were then confirmed by the person that conducted the testing. (*Id.*) On October 22, 2018, another company conducted another sample.(*Id.*) Afterwards, the new safety administrator instructed Plaintiff to replace his clothes and bedding due to the asbestos and mold exposure and advised him that materials inside the storage areas would need to be abated and destroyed due to asbestos contamination. (*Id.*)  He also issued a memorandum to Plaintiff reporting the finding of asbestos in both storage rooms on October 31, 2018. (*Id.* at 15.) The memorandum states that the air samples read negative for airborne asbestos. (*Id.* at 59.)

On November 9, 2018, Plaintiff visited sick call seeking medical treatment due to his

"extended exposure to cancer causing asbestos and breath-taking and asthma inducing mold." (*Id.* at 15.) During this sick call visit, Plaintiff was informed that the doctor would communicate with the nurse about what treatment the CDC recommended by November 13, 2018. (*Id.*) That date came and went, however, and "Plaintiff submitted to Warden Underwood his request for medical treatment..." (*Id.*)

On December 10, 2018, Plaintiff was reassigned from the Warehouse to the BOP's national facilities in Grand Prairie, Texas, five days a week. (*Id.*) Beginning on or about April 30, 2019, Plaintiff began the process of becoming approved to work specifically within the Regional Director's Office, but on May 26, 2019, a case manager informed him that the Regional Director's Office determined that he was "no longer to work at the Grand Prairie complex." (*Id.* at 17-18.) Plaintiff was reassigned as "town driver" for the satellite camp. (*Id.* at 18.) The trust fund administrator told him that he would not be given a reason for the reassignment, but that "reassignment was probably" due to the asbestos and mold exposure claims that he had raised. (*Id.*) The trust fund administrator also told Plaintiff that he would be receiving yearly check ups for any signs of asbestos-related illnesses, and that other staff exposed to asbestos and mold were being "represented by the Union" and were advised to get checked out by a medical professional. (*Id.*)

**C.    Administrative Exhaustion and Records Requests**

The BOP denied Plaintiff's BP-11 appeal related to his alleged asbestos exposure on April 9, 2019. (*Id.* at 17.); *see also* 28 C.F.R. §§ 542.10, 542.13, 542.14, 542.15, 542.18 (explaining the BOP 3-step administrative remedy process, culminating in the filing of a BP-11 appeal).

On November 23, 2019, Plaintiff filed a tort claim with the Regional Director of the BOP seeking $10,000,001.00 from the United States due to his asbestos exposure. (*Id.* at 18.) On

December 10, 2019, regional counsel for the Regional Director's Office for the South Central Region denied his claim. (*Id.* at 19.)

Two days later, under the Freedom of Information Act (FOIA), Plaintiff requested from the director of the BOP "all records, all documents, and all information in its possession and control pertaining to the reports findings asbestos and mold in both Storage 1 and 2 made on October 10, 2018, October 18, 2018, and October 22, 2018, at the FCI-Seagoville warehouse;" "all records, all documents, and all information pertaining to any bids made for the purpose of abating from both Storage 1 and 2 at the warehouse at FCI-Seagoville the Asbestos and mold found therein;" and "all records, all documents, and all information pertaining to ARC Abatement, including its bids, its invoices, and any certifications made by ARC Abatement, stemming from the abatement ARC abatement performed between May 1, 2019, through May 14, 2019, involving Storage 1 and 2 at the Warehouse at FCI-Seagoville involving the asbestos and mold." (*Id.* at 19.) At the time Plaintiff filed this suit, the BOP had not responded to the request, but it subsequently responded in January 2021. (*See* doc. 15-1 at 1.)

According to the declaration of a government information specialist with the United States Department of Justice Federal Bureau of Prisons South Central Regional Office in Grand Prairie, Texas, the agency deemed 100 pages of records responsive to the request.  (*See* doc. 15-1 at 1.) After staff members reviewed the responsive documents and redacted certain portions of responsive documents, BOP provided Plaintiff a determination letter, along with the responsive records, on January 11, 2021. (*Id.* at 1, 6.)[2]  It determined that 5 pages were appropriate for release in full, 9 pages were appropriate for release in part, and 86 pages had to be withheld entirely. (*See id.*)

---

[2]Plaintiff attached the entirety of the BOP's production to a declaration in connection with his opposition to the 12(b)(1) motion. (*See* doc. 21)

Plaintiff did appeal the adequacy of the BOP's initial response. (*See* doc. 20 at 3; doc. 20-1.)  On June 16, 2021, the Office of Information Policy remanded the appeal back to BOP for "further search for additional responsive records and further processing." (*See* doc. 30 at 1.)

## II. RULE 12(b)(1)

Both the United States and the BOP challenge the existence of subject matter jurisdiction over Plaintiff's claims against them under Federal Rule of Civil Procedure 12(b)(1). (docs. 12, 14.)

Federal courts are courts of limited jurisdiction; without jurisdiction conferred by the Constitution and statute, they lack the power to adjudicate claims. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted).  They "must presume that a suit lies outside this limited jurisdiction, and the burden of establishing federal jurisdiction rests on the party seeking the federal forum." *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001).

A Rule 12(b)(1) motion "may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006).  A court must dismiss the action if it determines that it lacks jurisdiction over the subject matter. Fed. R. Civ. P. 12(h)(3); *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998).  "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam).  A dismissal under Rule 12(b)(1) "is not a determination of the merits," and it "does not prevent the plaintiff from pursuing a claim in a court that does have proper jurisdiction." *Id*.  Accordingly, considering Rule 12(b)(1) motions first "prevents a court without jurisdiction from prematurely dismissing a case with prejudice." *Id*.

10

The district court may dismiss for lack of subject matter jurisdiction based on (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). A motion to dismiss based on the complaint alone presents a "facial attack" that requires the court to merely decide whether the allegations in the complaint, which are presumed to be true, sufficiently state a basis for subject matter jurisdiction. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1998). "If sufficient, those allegations alone provide jurisdiction." *Id*.

Here, the United States' motion relies solely on Plaintiff's complaint, so it presents a facial attack that does not require the resolution of factual matters outside the pleadings. *See Williamson*, 645 F.2d at 412-13. The BOP's motion presents a factual attack, however, because it has submitted a declaration in support of its motion.

## A.    <u>United States</u>

The United States argues that subject matter  jurisdiction over Plaintiff's FTCA claim is lacking based on the Inmate Accident Compensation Act (IACA),18 U.S.C. § 4126. (*See* doc. 12 at 3-4).

"The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." *Block v. N.D. ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Because federal sovereign immunity is jurisdictional in nature, the consent or waiver must be unequivocally expressed. *Freeman v. United States*, 556 F.3d 326, 335 (5th Cir. 2009).

11

Under the FTCA, "Congress waived the United States' sovereign immunity for claims arising out of torts committed by federal employees." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214 (2008); *see also* 28 U.S.C. §§ 1346(b)(1), 2671-2680. To successfully sue under the FTCA, a claim must be: (1) against the United States; (2) for money damages; (3) for injury or loss of property, or personal injury or death; (4) caused by the negligent or wrongful act or omission of any employee of the federal government; (5) while acting within the scope of his office or employment; and (6) under circumstances where the United States, if a private person, would be liable to the plaintiff in accordance with the state law where the act or omission occurred. 28 U.S.C. § 1346(b); *FDIC*, 510 U.S. at 477-78.

The FTCA does not apply when a plaintiff's injuries are covered by a comprehensive workers' compensation statute. *See United States v. Demko*, 385 U.S. 149, 152 (1966). When it applies, the IACA is the type of statute that precludes relief under the FTCA. *See Demko*, 285 U.S. at 152-53; *see also Aston v. United States*, 625 F.2d 1210, 1211 (5th Cir. Unit B Sept. 1980) (per curiam) (injuries sustained by federal inmates while working are not covered by the FTCA). It authorizes the Federal Prison Industries to compensate inmates "for injuries suffered in any industry or in any work activity in connection with the maintenance or operation of the institution in which the inmates are confined." 18 U.S.C. § 4126(c)(4). A "work-related" injury is defined as "any injury, including occupational disease or illness, proximately caused by the actual performance of the inmate's work assignment." *See* 28 C.F.R. § 301.102. Compensation may be obtained for physical impairment or death and for lost-time wages. *See* 28 C.F.R. § 301.101.

Here, the United States argues that Plaintiff's alleged asbestos exposure is a "work-related" injury to which the IACA applies, and "[b]ecause the IACA is the exclusive remedy for a prisoner's

work-related injuries, the FTCA does not apply," and there is no subject matter jurisdiction over his claims.

Plaintiff's alleged injury here is covered under the IACA because it was "sustained in...any work activity in connection with the maintenance or operation of the institution in which the inmates are confined" and was "proximately caused by the actual performance of the inmate's work assignment." 18 U.S.C. § 4126(c)(4); 28 C.F.R. § 301.102; *see also Smith v. United States*, 561 F.3d 1090, 1099 (10th Cir. 2009) (affirming dismissal of inmate's FTCA claims premised upon injuries from exposure to asbestos, which were undisputably work-related, noting that "when a federal prisoner's injuries are work-related, the Supreme Court has held that the prisoner's exclusive remedy against the government is the [IACA]; he cannot sue the government under the FTCA") (citing *Demko*, 385 U.S. at 152-54). Because Plaintiff cannot sue the United States under the FTCA, the Court lacks jurisdiction over his claim.

Plaintiff first responds that the Supreme Court has characterized the FTCA and *Bivens* actions as complementary causes of action, and because he asserts a constitutional tort claim under the Eighth Amendment, he should also be allowed to proceed with the same type of claim under the FTCA. (doc. 18 at 27-28.) As the Supreme Court noted in *Carlson*, the legislative history shows that when Congress amended the FTCA to allow for certain intentional tort actions, it envisioned parallel *Bivens* and FTCA suits in some instances for the same conduct—most notably the kind of intentional torts at issue in *Bivens*. 446 U.S. at 19-20 (citing S. Rep. No. 93-588, p. 3 (1973) (emphasis supplied). It did not, however, amend the statute to provide that an FTCA claim may always accompany a *Bivens* claim, or in any way abrogate the jurisdictional prerequisites for bringing an FTCA claim. As noted, the Supreme Court has interpreted the FTCA as inapplicable

to claims for which a comprehensive workers compensation scheme exists. *Carlson* did not deal with the interplay between the IACA and FTCA, much less purport to undermine *Demko*.

Plaintiff next contends that the Eighth Amendment's guarantee against cruel and unusual punishment rings hollow if the United States can simply "shuffle" inmate workers to the IACA, as opposed to paying them damages for constitutional tort violations under the FTCA. (doc. 18 at 29-30.)    The FTCA expressly does not apply to constitutional torts, however, so the premise of Plaintiff's argument is flawed. *See  FDIC*, 510 U.S. at 477.

Plaintiff lastly argues that the IACA is inapplicable because he was also exposed to asbestos when he was not working, as the asbestos particles lodged into his hair and clothes, and he carried them into his living quarters, making his injuries not work-related for purposes of the IACA . (doc. 18 at 30-31.) He points specifically to 28 C.F.R. §  301.301(c) and (d), entitled "Compensable and non-compensable injuries," which provides:

> Compensation is not paid for injuries sustained during participation in institutional programs (such as programs of a social, recreational, or community relations nature) or from maintenance of one's own living quarters. Furthermore, compensation shall not be paid for injuries suffered away from the work location (e.g., while the claimant is going to or leaving work, or going to or coming from lunch outside of the work station or area).[3]

Although the Fifth Circuit has not specifically considered the issue, other courts have rejected similar arguments in the context of state workers' compensation schemes, upon which *Demko* recognized that the IACA is patterned. For example, in *Boyer v. Weyerhaeuser Co.*, 39 F.Supp.3d 1036 (W.D. Wisc. 2014), the plaintiff alleged that during operations at the door

---

[3]This rule, known in workers' compensation parlance as a "coming and going rule" is "typical of workers' compensation statutes in general..." *Baynes v. United States*, 302 F. App'x 334, 335 (10th Cir. 2008) (stating that § 4126 is patterned after "compensation laws all over the country," with differences to accommodate the differing circumstances of prisoners and non-prisoners) (citation omitted).

manufacturing plant at which he was employed, asbestos fibers were released and contaminated the air in various settings in which no work-related activity occurred. He alleged specifically that "the operations of Weyenhauser's Marshfield plant caused dangerous asbestos fibers to be transported to areas more distant through various means, including without limitation: a. worker clothing, personal effects, hair and skin which has been contaminated by asbestos fibers at the plant; and b. collecting, removing, hauling, and dumping asbestos waste materials." *Id.* at 1039. The plaintiff argued that the workers' compensation statute was inapplicable because the injury (asbestos exposure) was not sustained while he was "performing service growing out of and incidental to his . . . employment," and because his "community exposures and take-home exposures do not as a matter of law...arise from the course of employment." *Id.* Rejecting his argument, the court noted:

> [t]he facts as alleged lead to the inescapable conclusion that this exposure was due in substantial part to Boyer's actions at work (e.g., cutting asbestos, cleaning up asbestos fibers, etc.), which he then transported in his hair, skin and clothing to other parts of the plant, areas immediately surrounding work, his car, home and other places where he regularly spent time.

*Id.* at 1042. It also noted that its finding was consistent with those of other courts in similar cases. *See, e.g., Silkwood v. Kerr-McGee Corp.*, 667 F.2d 908, 918-19 (10th Cir. 1981), *rev'd on other grounds*, 464 U.S. 238, (1984) (finding that Oklahoma's Workers' Compensation Act provided the exclusive remedy for injuries caused by exposure to radiation from plutonium found at the apartment of an employee of a nuclear fuel processing plant operated by defendants, noting that "[t]he fact that her apartment—and in particular, her bathroom, kitchen and bedroom—was contaminated, did not alter the court's finding that the injury occurred in the course of employment, finding "a logical nexus between Silkwood's injury and her work"); *Acevedo v. Consolidated Edison Co. of N.Y.*, 189 A.D.2d 497, 499, 596 N.Y.S.2d 68 (N.Y. App. Div. 1993) (affirming trial court's exclusion of tort

claims premised on employee's exposure to asbestos fibers remaining on clothing after returning home because "any damage resulting from such harm will clearly have arisen out of plaintiff's employment and is governed exclusively by the Workers' Compensation Law"); *Swanson v. Simpson Timber Co.*, No. B244266, 2013 WL 5469261, at *8 (Cal. Ct. App. Oct. 2, 2013) (unpublished) (finding so-called "secondary asbestos exposure" claim barred by the worker's compensation act because injury "is derivative as it is depending upon the compensable injury arising from and in the course and scope of Swanson's employment;" and (3) "Swanson's secondary self-exposure from the asbestos fibers and dust on his works clothes would not have occurred if he were not exposed to asbestos in the course and scope of his employment"). This jurisprudence is persuasive.

Plaintiff's allegations show that his asbestos exposure was a work-related injury, so the IACA applies to his claim for compensation against the United States for that injury.[4]  Because jurisdiction over his FTCA claim is lacking, it should be dismissed without prejudice.

**B.**    **BOP**

The  BOP contends that Plaintiff's FOIA claims for failure to timely locate and produce documents responsive to his requests are moot because it has now responded to the requests.  (*See* doc. 14.)

"Article III of the Constitution limits federal 'Judicial Power,' that is, federal-court jurisdiction, to 'Cases' and 'Controversies.'" *United States Parole Comm'n v. Geraghty*, 445 U.S.

---

[4]Plaintiff does not allege—nor could he, plausibly—that his injury actually occurred on the way to or from work, thereby invoking the coming-and-going rule. *See Hawkins v. Fowler*, Civil Action No. 09-639-JJB-CN, 2010 WL 1851072, at *2 (M.D. La. May 7, 2010) (describing the "going and coming" rule as the general principle that "an employee is not considered in the course and scope of employment in cases involving accidents occurring during travel to and from work").

388, 395 (1980). A case becomes moot "when the issues presented are no longer 'live' or the parties

lack a cognizable interest in the outcome." *Id.* at 396 (quoting *Powell v. McCormack*, 395 U.S. 486,

496 (1969)).

> This case-or-controversy requirement subsists through all stages of federal judicial
> proceedings, trial and appellate...The parties must continue to have a 'personal stake
> in the outcome' of the lawsuit. This means that, throughout the litigation, the plaintiff
> 'must have suffered, or be threatened with, an actual injury traceable to the defendant
> and likely to be redressed by a favorable judicial decision.'

*Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (internal citation and quotation marks omitted).

"Jurisdiction in a FOIA suit is based on the plaintiff's showing that an agency has (1)

improperly (2) withheld (3) agency records." *Goldgar v. Office of Admin., Exec. Office of the*

*President*, 26 F.3d 32, 24 (5th Cir. 1994) (citing *Kissinger v. Reporters Comm. for Freedom of the*

*Press*, 445 U.S. 136, 150 (1980)). Upon receipt of a request for records, an agency must make the

requested records promptly available to the requesting party, unless the records fall under one of

nine exemptions listed in the FOIA. 5 U.S.C. § 552(a) & (b). An agency has the burden of proving

that particular documents or portions thereof are exempt from disclosure. *Sharyland Water Supply*

*Corp. v. Block*, 755 F.2d 397, 398 (5th Cir. 1985). If an agency improperly withholds agency

records, a district court has jurisdiction to enjoin it from withholding those records and to order their

production. 5 U.S.C. § 552(a)(4)(B); *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 143

(1989). An agency record is "improperly" withheld if it does not fall within one of the nine

exemptions enumerated in the FOIA. *See Tax Analysts*, 492 U.S. at 150-51.

A plaintiff must exhaust administrative remedies before seeking judicial review. *Voinche*

*v. U.S. Dep't of Air Force*, 983 F.2d 667, 669 (5th Cir. 1993). "In evaluating exhaustion, the Fifth

Circuit distinguishes between FOIA claims based on the timeliness of the response and those based

on the adequacy of the response." *Matthews v. Executive Office for United States Attorneys*, Case No. 1:20-CV-370-RP-SH, 2021 WL 2910634, at *4 (W.D. Tex. May 10, 2021) (citing *Voinche v. FBI*, 999 F.2d 962, 963 (5th Cir. 1993)). "If an agency fails to respond to a FOIA request in a timely manner, the requestor is deemed to have exhausted its remedies and may bring an action in federal court." *Id.* at *4 (citing *Calhoun v. FBI*, F. App'x 487, 490 (5th Cir. 2013) (citing 5 U.S.C. § 552(a)(6)(C)). "If an agency timely responds but the response is deficient, the requester must challenge the adequacy of the response administratively before filing suit." *Id.* (citing *Voinche*, 999 F.2d at 963).

A timeliness claim is rendered moot by an intervening response. *Id.* (citing *Voinche*, 999 F.2d at 963); *see also Velasquez v. Nielsen*, 754 F. App'x 256, 262 (5th Cir. 2018) ("The district court found that appellants' [FOIA] untimeliness claims were mooted by DHS's belated response in producing the requested information. This holding is correct.") (citations omitted).  Plaintiff's FOIA claim is based entirely upon the timeliness of the record production and not its adequacy.  In support of its motion, the BOP has provided a declaration stating that it has now responded to Plaintiff's FOIA requests.

Plaintiff argues in response that a live controversy exists because the BOP's response was inadequate, as the BOP appears to have recognized in remanding for search of further documents. (doc. 19 at 12-18.)  This claim differs from the one presented in his complaint.  It is an adequacy claim that has not been exhausted and over which jurisdiction therefore is lacking. *See Matthews*, 2021 WL 2910634, at *4; *see also Voinche*, 999 F.2d at 963-64 (affirming district court's dismissal of FOIA claim where plaintiff did not challenge adequacy of agency response administratively before filing suit). The BOP's response to Plaintiff's FOIA request—regardless of its adequacy or

18

inadequacy—moots the timeliness claim, which is the only claim that he exhausted before filing suit and that he presented in his complaint.

Plaintiff's next argument is grounded in 5 U.S.C. § 552(a)(4)(C), which provides, in relevant part:

> Notwithstanding any other provision of law, the defendant shall serve an answer or otherwise plead to any complaint made under this subsection within thirty days after service upon the defendant of the pleading in which such complaint is made, unless the court otherwise directs for good cause shown.

(doc. 19 at 9-10.)  He argues that the term "plead" as used in federal statutes and rules does not envision the filing of a motion, and he points out that Rule 7 explicitly distinguishes between pleadings and motions.  For this reason, he claims, a FOIA defendant may not file a motion to dismiss, even for lack for lack of subject matter jurisdiction, in response to a FOIA complaint in federal court.  The Federal Rules of Civil Procedure explicitly allow for the filing of 12(b)(1) motions to dismiss for lack of subject matter jurisdiction in lieu of an answer, however, and apply "to the procedure in all civil actions and proceedings in the United States district courts, except as stated in Rule 81." Fed. R. Civ. P. 81. Rule 81 lists various types of proceedings in which the Federal Rules of Civil Procedure bow to more explicit statutory directives governing procedure, but FOIA actions are not listed. *See id.*  Moreover, a federal court can—indeed, must—raise the issue of subject matter jurisdiction *sua sponte*. *See Arbaugh*, 546 U.S. at 514.

Plaintiff next argues that mootness is determined at the time a complaint is filed and is not affected by subsequent events. (doc. 19 at 11-12.) This argument is incorrect as a matter of law because "any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot." *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006); *see also Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 526 (5th Cir.

2008) ("[D]evelopments subsequent to the filing of a citizen suit may moot the citizen's case.").

Finally, Plaintiff appears to claim that FOIA requires that an "officer" of the United States, as opposed to a mere "employee," respond to FOIA requests, so the Deputy Regional Counsel's response was constitutionally prohibited and therefore without effect. (*See* doc. 19 at 19-26.) If the Deputy Regional Counsel qualifies as a mere "employee" under the Appointments Clause, the action in responding to the FOIA request was void because only an "officer" can respond to a FOIA request; and (2) even if the Deputy Regional Counsel is indeed an Inferior Officer, her denial of Plaintiff's FOIA claim was improper because she was not appointed in accordance with the dictates of the Appointments Clause.

"The Appointments Clause of the Constitution lays out the permissible methods of appointing 'Officers of the United States,' a class of government officials distinct from mere employees." *Lucia v. S.E.C.*, 585 U.S. —, 138 S.Ct. 2044, 2049 (2018) (quoting Art. II, § 2, cl. 2). It also "divides federal government personnel into three categories: principal Officers, inferior Officers, and non-Officer employees. Principal Officers must be appointed by the President with 'the Advice and Consent of the Senate.' Inferior Officers may be appointed by 'the President alone,...the Courts of Law, or...the Heads of Department.' Non-Officer employees are 'lesser functionaries' in the government, and their appointment is not subject to this Clause." *Burgess v. Federal Deposit Insurance Corp.*, 871 F.3d 297, 300 (5th Cir. 2017) (citing *Edmond v. United States*, 520 U.S. 651, 659 (1997)) (quoting, in turn, U.S. Const. Art. II, § 2, cl. 2); *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 880 (1991) (quoting, in turn, *Buckley v. Valeo*, 424 U.S. 1, 126 n. 162 (1976)).  "A government worker is an 'Officer of the United States' subject to the Appointments Clause if he or she exercises 'significant authority pursuant to the laws of the United States.'" *Burgess*, 871 F.3d

20

at 300 (quoting *Edmond*, 520 U.S. at 662) (quoting, in turn, *Buckley*, 424 U.S. at 126). "A government worker is therefore an 'inferior Officer' subject to the Appointments Clause if his office entails 'significan[t]...duties and discretion.'" *Burgess*, 871 F.3d at 302 (citing *Freytag*, 501 U.S. at 881). "To decide that issue, this court must consider: (1) whether the office is 'established by law;' (2) whether the 'duties, salary, and means of appointment for that office are specified by statute;' and (3) whether the officeholder may "exercise significant discretion" in "carrying out...important functions." *Burgess*, 871 F.3d at 302 (quoting *Bandimere v. SEC*, 844 F.3d 1168, 1179 (10th Cir. 2016) (quoting, in turn, *Freytag*, 501 U.S. at 882). None of these factors support a finding that BOP's regional counsel is an Inferior Officer for Appointments-Clause purposes, and Plaintiff cites no authority for the proposition that a mere "employee" for Appointments-Clause purposes may not render a decision on a FOIA request.

In summary, Plaintiff's FOIA claims against the BOP are moot and should be dismissed without prejudice for lack of subject matter jurisdiction.

## II. RULE 12(b)(6)

The two individual defendants move to dismiss Plaintiff's *Bivens* claims against them under Rule 12(b)(6).

Rule 12(b)(6) allows motions to dismiss for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). Under the 12(b)(6) standard, a court cannot look beyond the face of the pleadings. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996); *see also Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999), *cert denied*, 530 U.S. 1229 (2000). It is well-established that "*pro se* complaints are held to less stringent standards than formal pleadings drafted by lawyers." *Miller v. Stanmore*, 636 F.2d 986, 988 (5th Cir. 1981). Nonetheless, regardless of whether the plaintiff is

proceeding *pro se* or is represented by counsel, pleadings must show specific, well-pleaded facts, not mere conclusory allegations to avoid dismissal. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992). The court must accept those well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Baker*, 75 F.3d at 196.

"[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citation omitted). Nevertheless, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasizing that "the tenant that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). The alleged facts must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In short, a complaint fails to state a claim upon which relief may be granted when it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (citations omitted). When plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570; *accord Iqbal*, 556 U.S. at 678.

22

As noted, a court cannot look beyond the pleadings in deciding a 12(b)(6) motion. *Spivey*, 197 F.3d at 774; *Baker*, 75 F.3d at 196. When a party presents "matters outside the pleadings" with a Rule 12(b)(6) motion to dismiss or in response to a Rule 12(b)(6) motion to dismiss, a court has "complete discretion" to either accept or exclude the evidence for purposes of determining the motion. *Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 196 n.3 (5th Cir. 1988); *accord Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F.App'x 775, 783 (5th Cir. 2007); *Walch v. Adjutant General's Dep.t of Tex.*, 533 F.3d 289, 293-94 (5th Cir. 2008). If "matters outside of the pleading[s] are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

Nevertheless, "pleadings" for purposes of a Rule 12(b)(6) motion include attachments to the complaint. *In re Katrina Canal Breaches Litig*., 495 F.3d 191, 205 (5th Cir. 2007); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Similarly, documents attached to a motion to dismiss or in response to a motion to dismiss "are considered part of the pleadings, if they are referred to in the plaintiff's complaint and are central to her claim[s]." *Collins*, 224 F.3d at 499 (quotations omitted); *accord Benchmark Elecs., Inc. v. J.M. Huber Corp*., 343 F.3d 719, 725 (5th Cir. 2003); *see Walch*, 533 F.3d at 293-94 (finding that reliance on documents attached to a response to a motion to dismiss was appropriate where the documents were "sufficiently referenced in the complaint"). It is also "clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007); *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994). Accordingly, documents falling in these three categories may be properly considered without converting the motion to dismiss into a motion for

summary judgment. *Ogbogu v. Navin*, No. 3:18-CV-1912-K-BH, 2019 WL 4307011, at *5-6 (N.D. Tex. Aug. 16, 2019), *rep. and rec. adopted nom. Ogbogu v. Acting Sec'y of Labor*, No. 3:18-CV-1912-K, 2019 WL 4303102 (N.D. Tex. Sept. 11, 2019).

Here, Plaintiff submitted a prisoner's civil rights complaint, with another operative complaint and other documents attached as exhibits. (*See generally* doc. 3). The attached exhibits are pleadings for purposes of Rule 12(b)(6) motions and may be considered without conversion of the individual defendants' motion to dismiss into a summary judgment motion. *See Collins*, 224 F.3d at 498.

A.    **"Physical Injury"**

The individual defendants first argue that Plaintiff's claims are barred by the physical injury requirement. (doc. 13 at 12.)

The Prison Litigation Reform Act (PLRA) provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury..." 42 U.S.C. § 1997(e)(e). The injury required by this statute "must be more than *de minimis* but need not be significant." *Alexander v. Tippah County, Mississippi*, 351 F.3d 626, 630-31 (5th Cir. 2003), *cert. denied*, 541 U.S. 1012 (2014).

In a nearly-identical recent case from this district concerning asbestos exposure at FCI-Seagoville, the Court relied primarily upon *Smith v. Leonard*, 244 F.App'x 583, 584 (5th Cir. 2007), in finding that a plaintiff's allegations of repeated sinus infections characterized by coughing, a sore throat, congestion, and drainage, were sufficient to meet the PLRA's physical injury requirement. *See Sheriff v. Christian*, *et al.*, No. 3:20-CV-0989-E (BH), 2021 WL 1968305, at *7 (N.D. Tex. Apr. 30, 2021), *rec. accepted*, 2021 WL 1966876 (N.D. Tex. May 17, 2021). In *Smith*, the Fifth

Circuit found that an inmate who complained of "headaches, sinus problems, trouble breathing, blurred vision, irritated eyes, and fatigue" allegedly resulting from "poor prison conditions consisting of lead paint, mold, asbestos, and unsanitary food slots" satisfied the PLRA's "physical injury" requirement. *See* 244 F. App'x at 584.

Here, Plaintiff alleges only that he suffered from unspecified "upper respiratory issues" marked by constrained nasal airways and nose bleeding. (*See* doc. 3 at 12.) These allegations are arguably insufficient to allege a physical injury, based on the cases cited by the individual defendants. *See, e.g., Mayes v. Travis State Jail*, No. A-06-CA-709-SS, 2007 WL 1888828 (W.D. Tex. June 29, 2007) (finding no proof of a physical injury to plaintiff where alleged exposure to mold resulted in sinus complaints); *Smith v. Fox*, C/A No. 4:05-1554-GRA-TER, 2006 WL 2090170, at *8 (D.S.C. July 25, 2006) (finding no proof of serious physical or emotional injury rising to a serious deprivation of a basic human need where plaintiff alleged that mold and mildew in his cell caused headaches, sinus infections, head cold, sores in nose, sores on side of mouth, and rash on arm); *Gill v. Shoemate*, No. Civ. A. 05-2124, 2006 WL 1285412, at *5 (W.D. La. May 8, 2006) (finding alleged injuries of headaches and eye and throat irritation were *de minimis*). These cases predate the Fifth Circuit's unpublished decision in *Smith*, however. In addition, the upper-respiratory issues Plaintiff alleges, including nose bleeding, are more similar to those previously found sufficient to meet the physical injury requirement in S*herriff* than to the ones alleged in the two cases from this circuit. Plaintiff has sufficiently alleged a "physical injury" for purposes of the PLRA, and motion to dismiss Plaintiff's complaint on this basis should be denied.

**B.    <u>Actionable Claim</u>**

The individual Defendants next argue that after the Supreme Court's decision in *Abbasi*,

Plaintiff's claims that they were deliberately indifferent to a serious risk of harm to him, in violation of the Eighth Amendment's prohibition on the imposition of cruel and unusual punishments, are no longer actionable under *Bivens*. (doc. 23 at 14.)

Because the individual Defendants are federal officers, Plaintiff's Eighth Amendment claims against them are fairly interpreted as arising under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *See, e.g., Montgomery v. Deitelbaum*, No. 3:09-CV-2407-M, 2010 WL 582146, at *2 (N.D. Tex. Feb. 18, 2010) ("Because pro se complaints are liberally construed, the courts apply § 1983 or *Bivens* according to the actual nature of the claims, not the label or characterization of a pro se plaintiff.") (citation omitted). In *Bivens*, the Supreme Court held that the violation of a person's constitutional rights by a federal official may give rise to an action for monetary damages in federal court. *Bivens*, 403 U.S. 388. *Bivens* mirrors but is not "'the substantial equivalent of 42 U.S.C. § 1983.'" *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1855 (2017) (citation omitted).

As the Fifth Circuit recently noted, the United States Supreme Court has reiterated that "*Bivens* was the product of an '*ancien regime*' that freely implied rights of action." *Oliva v. Nivar*, 973 F.3d 438, 442 (5th Cir. 2020) (quoting *Abbasi*, 137 S.Ct. at 1855) (quoting in turn *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001)). *Bivens* claims are now generally relegated to the only three circumstances in which the Supreme Court allowed a private right of action against federal officers for constitutional violations: (1) "manacling the plaintiff in front of his family in his home and strip-searching him in violation of the Fourth Amendment," *see Bivens*, 403 U.S. at 389-90; (2) "discrimination on the basis of sex by a congressman against a staff person in violation of the Fifth Amendment," *see Davis v. Passman*, 442 U.S. 228 (1979); and (3) "failure to provide medical

attention to an asthmatic prisoner in federal custody in violation of the Eighth Amendment," *see Carlson v. Green*, 446 U.S. 14 (1980).  *Oliva*, 973 F.3d at 442; *see also Butler v. S. Porter*, 999 F.3d 287, 293 (5th Cir. 2021) (finding that First-Amendment retaliation claim arose in new context and emphasizing that "in recent decades, the Supreme Court has 'consistently refused to extend *Bivens* to *any* new context") (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001) (emphasis in original) (citation omitted).

To determine whether *Bivens* allows a cause of action, courts must consider: (1) whether a case involves a "new context" that is distinct from these cases, and (2) whether any "special factors" preclude extending *Bivens* to this "new context." *Maria S. as Next Friend for E.H.F. v. Garza*, 912 F.3d 778, 784 (5th Cir. 2019) (citation omitted).  The Supreme Court has recently emphasized that its "understanding of a 'new context' is broad." *Hernandez v. Mesa*, — U.S.—, 140 S.Ct. 735, 743 (2020). Virtually anything other than the circumstances presented in *Bivens*, *Davis*, or *Carlson*  is a "new context" precluding the existence of a *Bivens* remedy if special factors counsel against extension. *Oliva*, 973 F.3d at 442 (citing *Abbas*i, 137 S.Ct. at 1865). The Supreme Court has also made clear that extending *Bivens* to new contexts is now a "'disfavored' judicial activity." *Abbasi*, 137 S.Ct. at 1857 (citation omitted).

### 1.    *New Context*

In deciding whether a plaintiff's claim arises in a new context under *Bivens*, the "proper test" is whether the case "is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Abbasi*, 137 S.Ct. at 1859; *see also Cantú*, 933 F.3d 414, 422 (5th Cir. 2019) ("Courts do not define a *Bivens* cause of action at the level of 'the Fourth Amendment' or even at the level of 'the unreasonable-searches-and-seizures clause.'") (citation omitted). "Indeed, it is not

enough even if 'a plaintiff asserts a violation of the same clause of the same amendment *in the same way.*'" *Oliva*, 973 F.3d at 442 (quoting *Cantú*, 933 F.3d at 422) (emphasis in original); *see also Canada v. United States*, 950 F.3d 299, 307 (5th Cir. 2020) ("Canada contends that the Supreme Court recognized a *Bivens* claim for Fifth Amendment Due Process violations in *Davis*, and thus his claims do not present a new Constitutional context. His reliance on *Davis* is misplaced. The Supreme Court has made clear that claims for violations of Fifth Amendment rights can still be brought in a new context. To be sure, '[n]o one thinks *Davis*—which permitted a congressional employee to sue for unlawful termination in violation of the Due Process Clause—means the entirety of the Fifth Amendment's Due Process Clause is fair game in a *Bivens* action.'") (quoting *Cantú*, 933 F.3d at 422). Although it did not "endeavor[] to create an exhaustive list of differences that are meaningful enough to make a given context a new one," the Supreme Court provided some examples that might be instructive:

> A case might differ in a meaningful way because the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Abbasi*, 137 S. Ct. at 1859-60.

In *Sherriff*, this Court found that nearly-identical allegations of an Eighth Amendment violation based on asbestos exposure at FCI-Seagoville arose in a new context for *Bivens* purposes. *See* 2021 WL 1968305, at *7. As in that case, Plaintiff also tries to liken his case to *Carlson*, which involved an Eighth Amendment deliberate indifference claim premised upon the failure to provide adequate medical treatment.   Plaintiff does not take issue with the medical treatment that he

received, however, and he did not name any medical officer as a defendant. His allegations are centered upon the failure to provide a safe working environment. His claims therefore arise in a new context under *Bivens*.

This result squares with other decisions, in addition to *Sheriff*. In *Dudley v. United States*, No. 4:19-cv-317-O, 2020 WL 532338 (N.D. Tex. Feb. 3, 2020), the plaintiff alleged deliberate indifference to her health and safety under the Eighth Amendment based on an alleged failure to protect her from verbal and psychological abuse, threats, and harassment at the hands of fellow inmates. Rejecting her argument that her claim was the same as in *Carlson* because it arose under the Eighth Amendment, the court noted that "*Carlson* had only recognized an implied damages remedy under the Eighth Amendment for '*failure to provide medical treatment*.'" 2020 WL 532338, at *5 (emphasis added); *see also Schwarz v. Meinberg*, 761 F. App'x. 732, 734 (9th Cir. 2019) ("Schwarz's Eighth Amendment claim regarding unsanitary cell conditions presents a new *Bivens* context because Schwarz does not allege a failure to treat a serious medical condition, which was the issue in *Carlson*... Rather the basis of Schwarz's claim—a nonfunctioning toilet—resembles the conditions of the confinement claim the Supreme Court rejected in *Abbasi*."); *Hoffman v. Preston*, No. 1:16-cv-01617-LJO-SAB (PC), 2019 WL 5188927, at *5 (E.D. Cal. Oct. 15, 2019), *rec. accepted*, 2020 WL 58029 (E.D. Cal. Jan. 6, 2020) ("In this case, Plaintiff's Eighth Amendment claim differs meaningfully from the Eighth Amendment claim in *Carlson* because Plaintiff's claim arises out of allegations that a correctional officer offered to pay inmates to harm Plaintiff and labeled Plaintiff a snitch in front of other inmates, not failure to provide medical care. Therefore,

Plaintiff's Eighth Amendment failure to protect claim accordingly arises in a new *Bivens* context.").[5]

Because Plaintiff's claims arise in a new context under *Bivens*, consideration of whether any "special factors" counsel hesitation in recognizing a new judicial remedy is required.

### 2.    *Special Factors Analysis*

"When a purported *Bivens* claim is asserted in a new context, *Abbasi* requires consideration of whether 'special factors' counsel against inferring such a cause of action in the absence of 'affirmative action by Congress' to create one.'" *Dudley*, 2020 WL 532338, at *6 (quoting *Abbasi*, 137 S.Ct. at 1857). This "inquiry must concentrate on whether the judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S.Ct. at 1857-58. A *Bivens* remedy should not be inferred if "there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong." *Id.* at 1858. "[I]f there is an alternative remedial structure present in a certain case," the existence of that process "alone may limit the power of the judiciary to infer a new *Bivens* cause of action." *Id.*

Here, special factors counsel against extending *Bivens* to Plaintiff's deliberate indifference claims. *See Sherriff*, 2021 WL 1968305, at *8 (concluding that special factors counseled against extending the *Bivens* remedy to Eighth-Amendment-asbestos-exposure claims). First, Congress has already legislated extensively with respect to prisoners' rights, and "legislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation." *Id.* at 1865. "Some 15 years after *Carlson* was decided, Congress passed the [PLRA], which made

---

[5]Additionally, *Carlson* involved deliberate indifference to the medical needs of one prisoner. Here, Plaintiff's claims are more general in nature and are targeted at a prison policy concerning exposing inmates to asbestos—not just his individual circumstances. This is a distinction the Supreme Court specifically mentioned in *Abbasi* as potentially significant. *See Abbasi*, 137 S.Ct. at 1859-60.

comprehensive changes to the way prisoner abuse claims must be brought in federal court." *Id.* (citing 42 U.S.C. § 1997(e)). "So it seems clear that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs." *Id.* "*Abbasi* makes clear that Congress could have extended the *Carlson* damages remedy to cases involving other types of prisoner mistreatment, but chose not to do so." *Dudley*, 2020 WL 532228, at *7.

Courts considering the extension of *Bivens* to new areas in the prison context have also noted that the "administration of the federal prison system" is a special factor counseling hesitation against such expansion. *See Nabaya v. Bureau of Prisons*, 3:19-CV-215-L-BN, 2020 WL 7029909, at *5 (N.D. Tex. Oct. 7, 2020), *rec. accepted*, 2020 WL 7027470 (N.D. Tex. Nov. 30, 2020); *see also Retzold v. Rostollan*, 946 F.3d 242, 248 n.2 (5th Cir. 2019) ("[We are unlikely to imply a *Bivens* remedy for this new context as 'special factors' counsel hesitation in federal prison administration.") (citing *Abbasi*, 137 S. Ct. at 1857-58); *Callahan v. Fed. Bureau of Prisons*, 956 F.3d 520, 524 (6th Cir. 2020)) ("'[L]egislative action suggesting that Congress does not want a damages remedy' counsels against judicial do-it-yourself projects. Congress paid close attention to inmate constitutional claims when it enacted the [PLRA]. The Act 'does not provide for a standalone damages remedy against federal jailers.'") (quoting, in turn, *Abbasi*, 137 S.Ct. at 1865) (citations omitted).

In addition, an alternative remedial process exists for Plaintiff, i.e., the Federal Bureau of Prisons' Administrative Remedy Program. "Under this program, prisoners can file grievances about any aspect of their confinement, the agency must provide written responses in specified time frames, and prisoners may appeal institutional-level responses to the agency's regional and central offices." *Dudley*, 2020 WL 532338, at *8 (citing 28 C.F.R. §§ 542.10-19 (2017)). Since *Abbasi*, numerous

courts have recognized the Federal Bureau of Prisons' Administrative Remedy Program as an alternative process and a special factor that forecloses expansion of the *Bivens* remedy. *See, e.g., Dudley*, 2020 WL 532338, at *7; *Begay v. Leap*, No. 3:17-CV-2639-N-BT, 2019 WL 1318410, at *3 (N.D. Tex. Feb. 6, 2019), *rec. accepted*, 2019 WL 1315901 (N.D. Tex. Mar. 22, 2019) ("[S]everal courts have explicitly recognized the administrative remedy program ('ARP') available in the prison setting as an alternative process foreclosing a personal-capacity damages remedy") (quoting *Brunson v. Nichols*, 2018 WL 7286410, at *3 (W.D. La. Dec. 7, 2018), *rec. accepted*, 2019 WL 545479 (W.D. La. Feb. 11, 2019)).[6]

Because Plaintiff's *Bivens* claims involve a new context under *Abbasi*, and because special factors exist counseling against the extension of *Bivens* to his claims, the individual defendants' motion to dismiss on this basis should be granted.

## C.    <u>Deliberate Indifference</u>

Alternatively, the individual defendants argue that Plaintiff's allegations fail to demonstrate deliberate indifference.

"While the Constitution does not require that custodial inmates be housed in comfortable prisons, the Eighth Amendment's prohibition against cruel and unusual punishment does require that prisoners be afforded 'humane conditions of confinement' and prison officials are to ensure that inmates receive adequate food, shelter, clothing, and medical care." *Herman v. Holiday*, 238 F.3d

---

[6] The individual defendants contend that the IACA also provides a "more than adequate remedy" to Plaintiff. (doc. 13 at 18.) The Fifth Circuit does not appear to have addressed this argument, and at least one appellate court has explicitly rejected it. *See Bagola v. Kindt*, 131 F.3d 632, 639 (7th Cir. 1997) (rejecting argument that the availability of the IACA to an injured inmate precluded a *Bivens* remedy because the statute, which establishes a no-fault worker's compensation system, does not further goals of deterrence). Because other factors counsel against extending a *Bivens* remedy to these facts, it is not necessary to determine whether the IACA precludes a *Bivens* cause of action here.

660, 664 (5th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825 (1994)). To establish an Eighth

Amendment conditions of confinement claim, the inmate must first establish that the deprivation

alleged was sufficiently serious; that is, that an official's act or omission must have resulted in the

denial of "the minimal civilized measure of life's necessities." *See id.* at 1977. Next, the inmate must

show that the prison official possessed a sufficiently culpable state of mind. *Id.* "The required state

of mind for cases related to prison conditions is that the official acted with deliberate indifference

to inmate health or safety." *See Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999). Deliberate

indifference is established by showing that the defendant officials "(1) were aware of facts from

which an inference of excessive risk to the prisoner's health or safety could be shown and (2) that

they actually drew an inference that such potential for harm existed." *Bradley v. Puckett*, 157 F.3d

1022, 1025 (5th Cir. 1998).

As for the first prong of the analysis, that the deprivation was sufficiently serious, the

Supreme Court has held that the Eighth Amendment protects prisoners from deliberate indifference

to conditions that pose an unreasonable threat to their future health. *See Helling v. McKinney*, 509

U.S. 25 (1993) (holding that an inmate may obtain injunctive relief under § 1983 based on exposure

to environmental tobacco smoke in the absence of a present physical injury). Courts have noted that

"mere exposure to moderate levels of asbestos is not actionable because asbestos remains in many

public buildings throughout the country." *Labounty v. Coughlin,* 137 F.3d 68, 74, n.5 (2d Cir. 1998).

They have instead focused on whether inmates are exposed to unreasonably high amounts of friable

asbestos.[7] The Fifth Circuit has found that inmates' unwilling exposure to an unreasonably high

---

[7] The term "friable asbestos" means asbestos that is "exposed and readily crumbled, as opposed to contained." *See Pack v. Artuz*, 348 F.Supp.2d 63, 79 (S.D.N.Y. 2004).

concentration of air-borne asbestos particles constitutes a cognizable claim under the Eighth Amendment. *See Herman*, 238 F.3d at 664-65; *see also Powell v. Lennon*, 914 F.2d 1459, 1463-64 (11th Cir. 1990) (denying qualified immunity to prison officials where plaintiff alleged friable asbestos particles were in the air of the prison dormitory and yet prison officials refused to remove him to another area); *LaBounty*, 137 F.3d at 74; (denying qualified immunity as to inmate's claim that he was exposed to friable asbestos after alerting the prison officials of the same, noting that "LaBounty's request to be kept in an asbestos-free environment constituted a serious medical need").

> Exposure to friable asbestos poses a significant health risk because airborne particles or fibers can become lodged in a person's lungs and in his respiratory tract. Over time this can lead to asbestosis, a nonmalignant scarring of the lungs that causes extreme shortness of breath and often death; lung cancer; gastrointestinal cancer; and mesothelima, a cancer of the lung lining or abdomen lining that develops as long as thirty years after the first exposure to asbestos and that, once developed, invariable and rapidly causes death.

*Pack*, 348 F.Supp.2d at 79. (citing *Environmental Encapsulating Corp. v. City of New York*, 855 F.2d 48, 50 (2d Cir. 1988)).

Here, Plaintiff alleges that he was exposed to friable asbestos for months while tasked with cleaning storage rooms. These allegations would normally satisfy the objective component of the conditions-of-confinement analysis. Notably, his complaint includes a memorandum from the new safety supervisor regarding test results indicating that there was no airborne asbestos in the warehouse storage areas. (*See* doc. 3 at 59.)  Nevertheless, accepting Plaintiff's well-pleaded facts as true and viewing them in the light most favorable to him, *see Baker*, 75 F.3d at 196, his allegations of prolonged exposure to friable asbestos are sufficient to satisfy the objective component of the conditions of confinement analysis.

As for exposure to mold, an unpublished decision from the Fifth Circuit found that mold

exposure may satisfy the objectively-serious component of the conditions-of-confinement analysis. *See Smith*, 244 F.App'x at 584 (inmate stated constitutional claim where he complained of poor prison conditions consisting of "lead paint, mold, asbestos, and unsanitary food slots" and suffered "headaches, sinus problems, trouble breathing, blurred vision, irritated eyes, and fatigue" as a result of the same). The bulk of district court jurisprudence in this Circuit is to the contrary. *See, e.g., White v. Lewis*, No. 1:16-CV-1074-P, 2016 WL 9225258, at *3 (W.D. La. Dec. 14, 2016) (dismissing conditions of confinement claim based upon the alleged presence of black mold and noting that, "[t]here are many different types of mold, not all of which are toxic. The mere fact that mold is present does not render Plaintiff's confinement unconstitutional"); *Smith v. Gusman*, Civil Action No. 14-1153-DEK, 2015 WL 2066517, at *2 (E.D. La. May 4, 2015) ("However, the jurisprudence has repeatedly held that the mere fact that mold is present in a jail does not render an inmate's confinement unconstitutional.") (collecting cases). As in *Sherriff*, it is assumed for purposes of the Rule 12(b)(6) analysis that exposure to "breathtaking mold" is the type of "sufficiently serious" condition necessary to meet the objective prong of the conditions of confinement analysis. *Sherriff*, 2021 WL 1968305, at *10; *see also Farmer*, 511 U.S. 825 at 835.

As for the second prong of the analysis, Plaintiff must also allege facts sufficient to support a reasonable inference that the individual defendants knew that of a substantial risk of bodily harm to him, but disregarded that risk by failing to take reasonable measures to abate it. *Taylor v. Stevens*, 946 F.3d 211, 221 (5th Cir. 2019). He makes the following allegations regarding their awareness of the risk: (1) the United States is required to presume its buildings constructed prior to 1980 were constructed with material containing asbestos; (2) on or about September 1, 2017, the warehouse supervisor emailed Administrator about the continued falling substances in the storage rooms in

"which Plaintiff was constantly having to clean off of all BOP property" (doc. 3 at 10); (3) as of or about September 23, 2017, Administrator was "made fully aware of the presence of hazardous materials, including asbestos containing material," having previously worked in commissary warehouse where asbestos had previously been "released, located, and abated" (doc. 3 at 21); (4) on or about September 30, 2017, the individual defendants visited the Warehouse to view the substances falling down from the ceiling and the overall condition of the storage areas; (5) on or about October 20, 2017, Administrator tested the black substances in the storage rooms, determining the substance to be only mildew; and (6) on October 27, 2017, Administrator arrived at the warehouse in a full body suit with respiratory protection to spray soapy substances into the rooms.

Nearly-identical allegations in *Sherriff* were found insufficient to show deliberate indifference on the part of these same two individual defendants. *See Sherriff*, 2021 WL 1968305, at *11. For the same reasons, the allegations in this case are also not sufficient to support a reasonable inference of deliberate indifference. Even assuming the Warehouse was constructed from material containing asbestos, the question is whether the individual defendants knew of and disregarded a substantial risk of bodily harm to Plaintiff from exposure to unreasonable amounts of it. According to Plaintiff, all indications pointed to a lack of friable asbestos exposure, at least as far as Administrator was aware. He alleges that Administrator tested the storage rooms but found that only mold was present. Further, while Administrator knew that asbestos previously existed in the Warehouse, according to Plaintiff's allegations, he also knew that it had been abated.[8]

---

[8] To the extent that Plaintiff suggests that the individual defendants knowingly used a defective testing methodology, he provides no facts to support this conclusory assertion. *See Ramirez v. Exxon Mobil Corp.*, 334 F.Supp.3d 832, 843 (N.D. Tex. 2018) ("Thus, courts no not accept 'conclusory allegations, unwarranted deductions, or legal conclusions,' at the motion to dismiss stage.") (quoting *Southland Secs. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)).

As for Warden, Plaintiff alleges that he possessed subjective knowledge of an unreasonable risk of harm because: (1) he was to presume the Warehouse, which was constructed before 1980, contained asbestos containing material; (2) he was aware of the "dusty substances, black chunks and smaller substances" falling from the walls in ceilings of Storage 2 (doc. 3 at 25); and (3) he visited the Warehouse with Administrator. There are simply no allegations from which it may be plausibly inferred that Warden knew that Plaintiff was exposed to dangerous levels of friable asbestos—especially when the initial testing revealed only mildew.

In conclusion, Plaintiff fails to state a claim for deliberate indifference against the individual defendants, and his claims against them are also subject to dismissal on this basis.[9]

## VII. PLAINTIFF'S MOTION TO FILE SUR-REPLY (DOC. 27)

Plaintiff moves for leave to fil a sur-reply. (doc. 27.) Defendants did not file an opposition.

The Local Civil Rules do not contemplate sur-replies. *See Comstock v. City of Balch Springs*, No. 3:17-CV-344-B, 2017 WL 2791113, at *1 (N.D. Tex. May 18, 2017). "[S]ur-replies are 'highly disfavored' and permitted only in 'exceptional or extraordinary circumstances.'" *Highmark, Inc. v. Allcare Health Management Systems, Inc.*, No. 4:03-CV-1384-Y (N.D. Tex. Sept. 29, 2015) (citing *Lacher v. West*, 147 F.Supp.2d 538, 539 (N.D. Tex. 2001)). A sur-reply is appropriate only when the movant presents new evidence at the reply stage and the respondent seeks leave of court to file one. *Brackens v. Dallas Indep. School Dist.*, No. 3:09-CV-642-D, 2010 WL 5464823, at *5 (N.D. Tex. Sept. 20, 2010). Here, no new evidence was presented at the reply stage, and Plaintiff has not shown why a sur-reply is warranted.

---

[9] The individual defendants also argue that, even assuming Plaintiff has plead a constitutional violation, the qualified immunity defense nonetheless precludes liability. Because Plaintiff has failed to plead a constitutional violation, this argument is not reached.

Nevertheless, the extent to which Plaintiff details the new arguments he seeks to assert in his proposed arguments allows consideration of their merits and a determination that they would not change the outcomes recommended above.

With regard to his *Bivens* claims, Plaintiff argues that the individual defendants note potential factual issues in their original brief and reply—whether he was exposed to friable asbestos at all, and whether Administrator was actually the Acting Safety Administrator at all or a "GS-7 Safety Specialist"—but ultimately conclude resolution of the issues is not necessary for purposes of their motion. (*See* doc. 27 at 2.)  He argues that they "wish to [have] the Court to take note of [something] which otherwise should not have come up involving their Motion to Dismiss." (*Id.*) Plaintiff continues that he never referred to Administrator as the "Acting Safety Administrator," but rather, the "Environmental and Safety Compliance Administrator." (*Id.* at 3.) He argues that this distinction is pertinent to the *Bivens* "new context" analysis because the rank of the officers involved is a potential factor for consideration under *Abbasi*, 137 S.Ct. at 1859-60.

As provided by Rule 12(b)(6) procedure, Plaintiff's allegations have been accepted as true, including his allegations of exposure to friable asbestos and Administrator's position as "Environmental and Safety Compliance Administrator." Whether the individual defendants have noted potential factual disputes on these matters down the road is immaterial at this stage.

Next, as to the United States' Rule 12(b)(6) motion, Plaintiff points out that it either misrepresented or misstated language in 28 C.F.R. § 0.97; it claimed to quote that regulation in its brief as stating that the director of the BOP could "redelegate to any of his subordinates any of the authority, functions or duties vested in him by this subpart Q, which includes the authority to consider and adjust federal tort claims..." (doc. 25 at 6.) He observes, however, that this is not

*exactly* what the regulation says. Plaintiff also argues that a sur-reply is necessary to address "whether a program statement can be the source of delegation of authority to act in regard to anything under the FTCA." (doc. 27 at 6.) Because jurisdiction is lacking, the United States' alternate Rule 12(b)(6) motion has not been considered.

Finally, Plaintiff also seeks to file a sur-reply to the BOP's motion to dismiss, reiterating that FOIA does not contemplate a motion to dismiss and applies to the exclusion of the Federal Rules of Civil Procedure. (doc. 27 at 8-9.) This argument has already been addressed, and he has not shown how further briefing is warranted. Plaintiff's motion for leave to file a sur-reply is denied.

## VIII. OPPORTUNITY TO AMEND

The Fifth Circuit is inclined to give *pro se* plaintiffs several opportunities to state a claim upon which relief can be granted. *See Scott v. Brynes*, No. 3:07-CV-1975-D, 2008 WL 398314, at *1 (N.D. Tex. Feb. 13, 2008); *Sims v. Tester*, No. 3:00-CV-0863-D, 2001 WL 627600, at *2 (N.D. Tex. Feb. 13, 2001). Courts therefore typically allow *pro se* plaintiffs an opportunity to amend their complaints when the action is to be dismissed pursuant to a court order. *See Robinette v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 3:96-CV-2923-D, 2004 WL 789870, at *2 (N.D. Tex. Apr. 12, 2004); *Sims*, 2001 WL 627600, at *2. Nonetheless, a court need not give an opportunity to amend where the court finds that the plaintiff has alleged his or her best case. *Jones v. Greninger*, 188 F.3d 322, 327 (5th Cir. 1999).

Here, Plaintiff's claims are fatally infirm, so no opportunity to amend is warranted. *See Ricardo v. Bank of New York Mellon*, CIVIL ACTION H-16-3238, 2017 WL 3424975, at *16 (S.D. Tex. Aug. 9, 2017) (noting that leave to amend should be denied if the Court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on

its face…") (quoting 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Proc.* § 1487 (2d ed. 1990)).

## IX. RECOMMENDATION

The United States' motion to dismiss (doc. 12) should be granted in part, and Plaintiff's FTCA claim should be **DISMISSED** without prejudice for lack of subject matter jurisdiction. Mark Christian and Ernesto Rosales' motion to dismiss (doc. 13) should be granted in part, and Plaintiff's *Bivens* claims against them should be **DISMISSED** with prejudice for failure to state a claim. The Bureau of Prisons' motion to dismiss (doc. 14) should be granted, and Plaintiff's FOIA claim should be **DISMISSED** without prejudice as moot.

**SO RECOMMENDED** on this 24th day of August, 2021.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE